UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

CARL JOSEPH MCDANIEL,

        Plaintiff,

      v.                              Case No. 17-CV-1493

DR. SALAM SYED,
MICHAEL FINK,
SUSAN NOVAK,
DAN WINKLESKI, and
WISCONSIN DEPARTMENT OF CORRECTIONS,

        Defendants.

## DECISION AND ORDER

       Plaintiff Carl Joseph McDaniel, an inmate at Oshkosh Correctional Institution, brought this action against staff at Columbia Correctional Institution and New Lisbon Correctional Institution for failure to adequately provide for his medical needs and accommodate his disability. His medical conditions include hypertension, chronic obstructive pulmonary disease, chronic kidney disease, type 2 diabetes complicated by neuropathy, gout, fibromyalgia, anxiety, a history of alcohol abuse, and degenerative joint disease in his spine with spinal stenosis that required surgical intervention in July 2017. Plaintiff challenges the conditions under which he was housed at Columbia and New Lisbon. He contends that he must be held in a single cell with toilet facilities that is handicap accessible and has a lower bunk. His claims arise under the Americans with Disabilities Act (ADA), § 504 of the Rehabilitation Act, and the Eighth Amendment. He also seeks injunctive relief. This matter comes before the court on Defendants' motion for summary

judgment. For the following reasons, Defendants' motion will be granted and the case will be dismissed.

## PRELIMINARY MATTERS

Before turning to the substance of the parties' arguments on summary judgment, the court must address certain preliminary matters. Five days after Plaintiff filed his response to Defendants' motion for summary judgment, Plaintiff filed a motion to amend his summary judgment submission, to amend his complaint to add Oshkosh Correctional Institution as a defendant, to seek declaratory judgment against Oshkosh, and to add claims of elder abuse. Plaintiff's motion to amend violates Civil Local Rule 15, as Plaintiff has failed to file a proposed amended complaint as an attachment to his motion. Civil L.R. 15(b) ("A motion to amend a pleading must state specifically what changes are sought by the proposed amendments. The proposed amended pleading must be filed as an attachment to the motion to amend.").

Even if Plaintiff had properly complied with the local rules, his motion would be denied in any event. "Rule 15(a) declares that leave to amend 'shall be freely given when justice so requires'" absent "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962) (internal citation omitted). "Motions for leave to amend are generally denied on the basis of undue delay when they are filed long after the filing of the original pleading and after extensive litigation." *Hoenig v. Karl Knauz Motors, Inc.*, 983 F. Supp. 2d 952, 959 (N.D. Ill. 2013). Plaintiff provides no reason for waiting until the briefing was nearly complete on Defendants' motion for summary judgment to request to amend his pleadings. This undue delay is a sufficient basis upon which to deny Plaintiff's request. *See Foman*, 371 U.S. at 182. The

2

current defendants are entitled to have the allegations against them resolved without further delay. Therefore, Plaintiff's motion is granted as to his request to amend his response to Defendants' motion for summary judgment and denied in all other respects.

Plaintiff has filed a number of motions for a preliminary injunction and temporary restraining order regarding the conditions of his confinement at Oshkosh Correctional Institution. The relief Plaintiff seeks is not warranted because the claims in the motions are unrelated to the underlying claims in the complaint. Accordingly, Plaintiff's motions will be denied.

In addition, Plaintiff failed to properly respond to Defendants' proposed findings of fact in accordance with Civil Local Rule 56. Pursuant to the local rules, along with the motion for summary judgment, the moving party is required to file either a statement of material facts to which the parties have stipulated or a statement of proposed material facts as to which the moving party contends there is no material issue and that entitle it to judgment as a matter of law. Civil L.R. 56(b)(1). The statement of proposed findings of fact is comprised of numbered paragraphs, containing short factual statements and specific references to affidavits, declarations, parts of the record, and other supporting materials. Civil L.R. 56(b)(1)(C). Defendants in this case submitted proposed findings of fact in support of their motion for summary judgment in compliance with the local rules. Dkt. No. 189.

The party opposing the motion must file a response to the moving party's statement of undisputed facts which is intended to make clear which, if any, of those facts are in dispute, and to set forth any additional facts that bear on the motion. The opposing party's response must reproduce each numbered paragraph of the moving party's statement of facts followed by a response to each paragraph. Civil L.R. 56(b)(2)(B). If the fact is disputed, the party must include a specific reference to an affidavit, declaration, or other part of the record that supports the claim

3

that a genuine dispute exists as to the fact stated by the moving party. *Id.* If the opposing party believes there are additional facts that prevent the entry of summary judgment, he should include a statement, consisting of short numbered paragraphs that set forth each additional fact and include references to the affidavits, declarations, or other parts of the record that support the assertion. Civil L.R. 56(b)(2)(B)(ii). Defendants, as required by this court's local rules, included a copy of Federal Rule of Civil Procedure 56, Civil Local Rule 7, and Civil Local Rule 56 in their motion for summary judgment.

Although Plaintiff responded to Defendants' proposed findings of fact and submitted his own proposed findings of fact, not all of his responses or his own proposed findings of fact cite to an affidavit, declaration, or specific part of the record to support them. Plaintiff received proper notice detailing how to respond to Defendants' proposed findings of fact in compliance with the local rules. As a result, the court will only consider Plaintiff's proposed facts and his responses to Defendants' proposed facts to the extent they comply with the local rules. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994) ("We have . . . repeatedly upheld the strict enforcement of [local] rules, sustaining the entry of summary judgment when the non-movant has failed to submit a factual statement in the form called for by the pertinent rule and thereby conceded the movant's version of the facts."); *Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 809–10 (7th Cir. 2005) ("A district court does not abuse its discretion when, in imposing a penalty for a litigant's non-compliance with [the local rules], the court chooses to ignore and not consider the additional facts that a litigant has proposed."); *Hinterberger v. City of Indianapolis*, 966 F.3d 523 (7th Cir. 2020). With these considerations in mind, the court turns to Defendants' motion for summary judgment.

## BACKGROUND

Plaintiff is an inmate in the custody of the State of Wisconsin Department of Corrections. During all times relevant to this lawsuit, he was housed at Columbia Correctional Institution from December 6, 2017, to December 11, 2018. He was then transferred to New Lisbon Correctional Institution and is now housed at Oshkosh Correctional Institution.

Daniel Winkelski is currently employed by Corrections as the Warden at New Lisbon Correctional Institution and has held the position since April 29, 2018. Susan Novak is currently employed by Corrections as the Warden at the Redgranite Correctional Institution. She was the Warden at Columbia Correctional Institution from August 2018 until March 2020. Dr. Salam Syed was employed by Corrections as a physician at Columbia Correctional Institution from 2014 until December 18, 2018. Michal Fink is currently employed by Corrections as a Corrections Unit Supervisor at the Columbia Correctional Institution and has held the position since May 2016.

### A. Columbia Correctional Institution

Prior to his incarceration, Plaintiff's health issues included chronic back pain, stage 3 chronic kidney disease, and type 2 diabetes. He was also diagnosed with bipolar disorder and PTSD. His current medical record show Plaintiff to be an inmate with multiple medical problems including hypertension, chronic obstructive pulmonary disease, chronic kidney disease, type 2 diabetes complicated by neuropathy, gout, fibromyalgia, anxiety, a history of alcohol abuse, and degenerative joint disease in his spine with spinal stenosis that required surgical intervention in July 2017. As of May 7, 2018, Plaintiff's medical conditions were determined to be overall stable and well cared for by the medical director of the Department of Corrections' Bureau of Health Services.

5

Since 2016, Plaintiff has seen multiple specialists including neurology, neurosurgery, rheumatology, nephrology, and pain for his chronic low back pain. He underwent bilateral carpal tunnel release in December 2016 with Dr. Grossman and recovered well. In early 2017, Plaintiff's chronic low back pain worsened, and he was treated with physical therapy, injections, and medications for pain control. Some medications needed to be limited due to concurrent kidney disease. At that time, Plaintiff's back pain apparently left him with significant mobility problems, and he was seen by Neurosurgery in early- to mid-2017. In July 2017, Plaintiff underwent wide decompression lumbar laminectomy, medial facetectomy, foraminotomy L3/L4, L4/L5 and nonfusion lumbar stabilization using an interlaminar Coflex device. Prior to the surgery, Plaintiff was reported to be wheelchair bound, but post-surgery, he was able to ambulate with a walker. The surgeon recommended he continue with physical therapy for walking and stabilization and continue to improve his walking without any support. The surgeon further noted, "May climb stairs." Since surgery in July, Plaintiff has continued to see pain clinic specialists and received spinal steroid injections with variable relief of symptoms.

Housing assignments at Columbia are made by one of the unit managers, typically the Restricted Housing Unit Manager. All new inmates at Columbia are initially housed in the intake unit for a month. Once they successfully finish orientation, they are transferred out of the intake unit to another housing unit with available space. If the inmate has certain restrictions, the unit manager doing housing assignments will make sure he is properly placed to accommodate the restrictions. The majority of units have stairs to reach the tiers where cells are located. Housing Unit 6 is the only unit at Columbia with lift or elevator access. It is often difficult to place an inmate in H6 due to the number of inmates needing elevator access. If an inmate presents an immediate need to be housed on a unit with elevator access, room must be made for the inmate

and other inmates who do not have mobility restrictions will be moved to accommodate such needs.

Upon intake, all new inmates are evaluated by the Health Services Unit (HSU) to determine the appropriate restrictions. On January 3, 2018, Plaintiff was assessed by physical therapist Hoechst to evaluate his mobility on the unit. During this assessment, Plaintiff successfully went up and down six stairs. Hoechst determined he was safe to ambulate the stairs and he would benefit from physical therapy. He discontinued Plaintiff's no-stair restriction and low tier restriction, but he continued Plaintiff's low-bunk restriction and 4-wheel walker restriction. He also ordered six sessions of physical therapy to increase strength, mobility, endurance, and core strength. After reviewing Hoechst's notes, Dr. Syed signed off on the order later that day. Plaintiff was assigned to Housing Unit 8. As the Unit Manager of H8 and H9, Fink did not personally determine which inmates would be assigned to his units. After the unit was assigned, it was his general practice to delegate the specific cell assignments of inmates on H8 and H9 to the unit sergeant. Because Plaintiff did not have a restriction for a single cell, he was not placed in one. Novak did not directly participate in housing assignments, was not involved in Plaintiff's move from the intake unit with no stairs to a unit with stairs, and was not the warden at the time of the move.

Dr. Syed assessed Plaintiff on January 10, 2018. At the appointment, Plaintiff complained he needed a feed in cell restriction because he could not get out of his cell to eat. He was observed walking on his unit, so Dr. Syed was not convinced it was in Plaintiff's best interest to stay in his cell. Based on his assessment and review of Plaintiff's records, Dr. Syed concluded that Plaintiff needed to move to maintain his ability walk around and that there was no need to be fed in his cell. Dr. Syed directed him to take Tylenol as needed for his discomfort.

Plaintiff complained to Fink several times that he was not receiving adequate accommodations, he was in pain, and he needed a handicap cell. On multiple occasions, Plaintiff walked to Fink's office to report these concerns, and Fink observed him climbing the stairs to do so. Although Plaintiff appeared to be in pain, he was able to successfully go up and down the stairs. Unit staff observed Plaintiff scoot down the stairs rather than stand and use the handrail to assist himself down. Fink told Plaintiff that the behavior was not appropriate because the doctors were under the impression that Plaintiff could walk and use the stairs properly.

On January 12, 2018, Fink arranged for Plaintiff to be seen in HSU after Plaintiff reported he fell in his cell and broke his tooth that day. He again asked about a handicap cell, but there were none available in H8. Plaintiff complained he was not receiving adequate accommodations or pain management. He was evaluated by a nurse and the Health Services Unit Manager. During the assessment, Plaintiff did not report breaking a tooth. He had no redness, bruising, or abrasions and was able to perform range of motion exercises. Dr. Syed did not find it medically necessary to order a handicap cell.

On January 29, 2018, HSU received a Health Service Request (HSR) from Plaintiff dated January 28 stating he fell off the toilet on January 12 and broke his molar. An Advanced Care Provider saw Plaintiff on February 12. At the appointment, Plaintiff did not have any dental complaints. On February 26, 2018, Dr. Syed saw Plaintiff for a follow up on his continued back pain. He referred him to the pain clinic at Waupun Memorial Hospital because he reported his pain was not improving. On March 15, 2018, Plaintiff was reassigned to H9. Because Fink was familiar with his complaints about his accommodations, Fink had the unit sergeant place Plaintiff in a cell at the end of the tier so he would be closest to the showers.

That same day, Plaintiff submitted an Information/Interview Request and a Reasonable Modification/Accommodation Request to the ADA Coordinator complaining that he was being denied meals and other programs because of his mobility issues and pain and that he needed a handicap cell. ADA Coordinator Schmidt responded to Plaintiff's Accommodation Request on March 22, 2018, indicating that, after consulting with HSU and Physical Therapy, a handicap cell was not necessary. She also responded to the Information Request, stating it was determined that Plaintiff was capable of leaving his tier and thus was not being denied access to meals or programs.

Plaintiff continued to complain about his accommodations and restrictions, but Fink did not have the authority to issue medical restrictions and encouraged Plaintiff to submit HSRs to address his complaints. In addition, Fink did not have the unilateral authority to issue Plaintiff a single cell restriction, as the restriction must be approved by the multi-discipline team, which reviews all accommodation requests. Fink was aware that HSU had evaluated Plaintiff multiple times and had not determined that a single cell was necessary. Based on this information, Fink did not believe it was necessary to place Plaintiff in a single cell pending a determination by the multi-discipline team.

Plaintiff did not go to the dayroom for meals and began asking that meals be delivered to his cell. Because Plaintiff did not have a restriction to be fed in his cell, Fink arranged for Plaintiff to be seen in HSU regarding his concern over the situation. If an inmate is too ill to walk to the cafeteria for meals, he must inform the Unit Manager or Sergeant, who contacts HSU. After the inmate is evaluated in HSU, if it is determined that a restriction is necessary, such as feed in cell or sick cell, HSU would call the security staff on unit and inform them of the restriction. The restriction would then be immediately accommodated. Feed in cell restrictions are temporary and never permanent, as the restriction is intended to aid in recovery from short illnesses.

On March 27, 2018, a nurse saw Plaintiff regarding Fink's concern that Plaintiff was not attending meals. Plaintiff told the nurse that he did not submit HSRs regarding his medical issues because he did not want to be seen by Dr. Syed. Plaintiff complained that he had no medications, he could not go up and down the stairs, and he wanted tramadol. The nurse explained that he was denied long-term tramadol in November 2017. Plaintiff stated he wanted to be in a wheelchair-accessible unit and a single cell, and that those accommodations would allow him to leave his cell. The nurse explained that he did not meet the criteria for either. Plaintiff was educated that many people live in pain and that he would have to endure some level of it if he wants to participate in activities. The nurse encouraged Plaintiff to leave his cell for meals and advised he could use his cane for the stairs. She warned that muscle atrophy from lack of movement could result in the inability to walk in the future. Plaintiff was not issued a feed in cell restriction.

On April 13, 2018, Dr. Syed saw Plaintiff to discuss his chronic pain. Plaintiff complained he wanted a handicap cell because of his back pain. Based on his assessment, Dr. Syed did not believe there was any reason to declare Plaintiff handicapped or put him in a handicap cell at that time. Plaintiff had an appointment scheduled for an MRI and to be seen by Dr. Choi at the pain clinic. Dr. Choi saw Plaintiff on April 20, 2018 at Waupun Memorial Hospital Center for Pain Control. Dr. Choi performed a cervical interlaminar epidural steroid injection under fluoroscopy to address Plaintiff's cervical disc displacement. Although Dr. Choi recommended Plaintiff be put in a cell with no top bunk, placement of inmates in cells with specific accommodations is determined at the institutional level. Advanced Care Providers at Columbia do not, as a rule, follow outside provider recommendations on cell assignments because of the various DOC policies, procedures, and security protocols that affect how inmates are housed.

10

Dr. Syed saw Plaintiff on May 25, 2018. During the visit, Plaintiff stated he wanted a single cell and felt like he was going to pass out when going up and down stairs. Dr. Syed prescribed metformin and glyburide, which treat diabetes. He also increased Plaintiff's lisinopril, which treats high blood pressure. On May 30, 2018, Plaintiff was seen by nursing, and he reported he was not taking his medications due to not being able to get up the stairs. Nursing evaluated him and advised him to take his medications as prescribed. Fink observed Plaintiff climb the stairs to the dayroom at other points in the day, other than meal or medication pass. For instance, Plaintiff would climb the stairs to speak to Fink and when canteen or property were delivered to the dayroom. Plaintiff appeared to be able to climb the stairs freely. Plaintiff did not submit any HSRs reporting he was missing medication doses due to being unable to climb the stairs because of his pain. Plaintiff's prescribed medications to treat his various diagnoses included acetaminophen, montulakast, senna plus, glipizide, lisinopril, tamsulosin, ammonium lactate, fiber pills, allopurinol, Excedrin, Tylenol 500 mg, naproxen, simvastatin, milnacipran, burtuone, buspirone, bisacodyl, simuastatin, calcitrol, Duoreb, doxepin, ranitidine, fluoxetine, Acetaminophen, baby aspirin, vitamin D, hydrocortisone cream, and capsaicin cream. By refusing to take them as prescribed, the medications are not able to work properly and eventually Plaintiff would suffer the same effects as if he had not been prescribed the medication. Plaintiff contacted Novak regarding his low-bunk restriction. Her office responded on September 27, 2018, indicating that he had a low-bunk restriction in place since January 3, 2018.

RN Frank responded to Plaintiff's September 25 HSR, indicating that an appointment was scheduled with Dr. Syed. On October 11, 2018, Dr. Syed saw Plaintiff for multiple concerns, and a follow up to his visit to the emergency room the night before due to chest pains. Plaintiff complained of anxiety and asked about pain medications. Based on Dr. Syed's assessment and

11

the extensive cardiac workup completed in the past, he believed Plaintiff was displaying attention-seeking and drug-seeking behavior that must be discouraged. Plaintiff also complained that he needed a disabled cell, but Dr. Syed noted he was not convinced Plaintiff was reliant on the wheelchair. On October 25, 2018, nursing gave Plaintiff a restriction allowing him to keep a basin in his cell to wash his clothes, if needed. Fink was not aware of Plaintiff washing his clothes in his sink or toilet. If an inmate soils his clothing, he simply needs to notify staff and they will timely provide clean clothing and have the soiled clothing sent to the central laundry.

Plaintiff was seen by Dr. Maursetter at UW Health Fitchburg Kidney Clinic via Telemed on November 5, 2018. She recommended Plaintiff limit his use of nonsteroidal anti-inflammatory drugs (NSAIDs), believing it was likely causing his decreased renal function and recommended he use a warm compress to help with neuropathic and chest pain. Plaintiff saw an Advanced Care Provider and an Advanced Practice Nurse Prescriber on November 30. At this appointment, a new order for adult diapers was issued. Fink was not aware that Plaintiff needed adult diapers. If HSU determined they were necessary, the nurse or advanced care provider would write an order for them. The adult diapers would be delivered and kept in the cell with Plaintiff for use when needed.

### B. New Lisbon Correctional Institution

During his incarceration at New Lisbon, Plaintiff did not take psychotropic medication to help control his bipolar disorder or PTSD. The symptoms of his PTSD include nightmares, daymares, hyper-reacting to nonthreatening situations he sees threats in, night terrors, and anxiety attacks. Once at New Lisbon, Plaintiff requested a medical mattress, an extra plastic chair to help provide stability when toileting and getting out of bed, adequate medication, a soft cuff restriction, and snack bags for breakfast.

12

At New Lisbon, Plaintiff was housed in a wet cell, that is a cell equipped with a toilet and a sink. He had no cellmate. Plaintiff had a low-bunk restriction as well as second extra pillow and second extra blanket restrictions for comfort while sleeping. After meeting with the ADA coordinator, physical therapist, head nurse, and unit manager at New Lisbon, a bunk was tailored and remade to specifically meet Plaintiff's physical needs. Plaintiff was asked if he wanted the top bunk removed, but he chose for it to remain so he could use it as a shelf. Plaintiff spends most of the day resting in bed. Plaintiff was never told by a doctor not to walk up stairs, but he had a wheelchair restriction to use for long distances, and he was able to use a wheelchair whenever he needed one, as well as a shower chair restriction. Plaintiff's incontinence had not been resolved since being housed in a single wet cell, but Plaintiff has access to all the adult diapers he needs. Inmates at New Lisbon are not required to wash their own clothes in the sink. If an inmate does soil his clothes, the clothes are placed in a biohazard bag, washed, and returned to the inmate. Plaintiff would not be moved from the single wet cell unless he is taken to Restricted Housing due to a conduct report, placed in observation status, or placed for COVID-19 quarantine purposes. All cells in Restricted Housing are single wet cells.

On May 1, 2019, Plaintiff was issued Conduct Report #14757. He was charged with three code violations: 303.30 soliciting an employee, 303.28 disobeying orders, and 303.29 disrespect. These charges were the result of an interaction on April 29, 2019 during which Plaintiff asked his Psychological Services Unit (PSU) clinician to help him with his lawsuit. Specifically, when Plaintiff arrived for his scheduled appointment, he brought copies of Wisconsin statutes with him, discussed his intention to file a lawsuit against a New Lisbon officer for elder abuse, and asked the clinician to assist him. When the clinician declined, he told her that she was "bound by law." Plaintiff had been told that the clinician's only role was to address his mental health needs.

Christina McGinn wrote up and submitted the conduct report, and Security Director Larry Fuchs and Lieutenant Travis Haag signed off on it. Plaintiff was given 60 days of disciplinary separation.

Plaintiff received Conduct Report #15701 for another incident that occurred on April 29, 2019, wherein he wrote to social worker Susan Screnock asserting that a corrections officer refused to give him prescribed medication. Upon investigation, it was discovered that Plaintiff had not been denied medication but had received his medication within 15 minutes. Plaintiff was found guilty of lying about an officer and received 60 days of disciplinary separation. These 60 days ran concurrent with the 60-day disciplinary separation he received for the first conduct report. Plaintiff was released from disciplinary separation on June 28, 2019. Winkleski did not write the conduct report that led to Plaintiff's discipline and was not involved in issuing the discipline. Plaintiff did not send Winkleski any correspondence claiming he was being retaliated against for making complaints.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the court must view the evidence and make all reasonable inferences in the light most favorable to the non-moving party. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to

14

the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## ANALYSIS

### A. Americans with Disabilities Act and Rehabilitation Act Claims

Plaintiff alleges that being placed in a cell on a unit with stairs, with an upper bunk, and without an accessible toilet at Columbia failed to effectively provide him with meals, medical care, activities, and programming provided to other inmates in violation of the ADA and Rehabilitation Act. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The Rehabilitation Act similarly provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). Because the relief available under Title II of the ADA and the Rehabilitation Act is "coextensive," courts generally proceed by analyzing the claim under the Rehabilitation Act to avoid "thorny questions of sovereign immunity" presented by ADA claims. *Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 671–72 (7th Cir. 2012).

To establish a claim under the Rehabilitation Act, a plaintiff must prove that "(1) he is a qualified person (2) with a disability and (3) the Department of Corrections denied him access to a program or activity because of his disability." *Id.* at 672 (citing 29 U.S.C. § 705(2)(B)). Defendants do not dispute that Plaintiff has a disability as defined by the Act or that Plaintiff was otherwise eligible for the same programs and services as other similarly situated inmates. Thus,

the only issue is whether Defendants denied Plaintiff access to programs or activities because of his disability.

"Refusing to make reasonable accommodations is tantamount to denying access; although the Rehabilitation Act does not expressly require accommodation, 'the Supreme Court has located a duty to accommodate in the statute generally.'" *Id.* at 672 (quoting *Wis. Cmty. Serv. V. City of Milwaukee*, 465 F.3d 737, 747 (7th Cir. 2006). Plaintiff has not established that Defendants failed to provide him with reasonable and necessary accommodations. Plaintiff wanted to be housed in a single cell on the one unit at Columbia with elevator access because he claimed that walking up and down stairs was too painful for him. But Plaintiff's medical providers determined these restrictions were inappropriate, and they never restricted Plaintiff from ascending and descending stairs. Instead, they encouraged him to be as active as possible to avoid muscle atrophy and encouraged him to attend physical therapy so that he would not become completely disabled. The institution provided Plaintiff with a walker that converted into a seat, and Plaintiff was prescribed several medications to address his physical ailments. Plaintiff was frequently observed successfully going up and down the stairs with his walker. In short, Plaintiff was medically able to ascend and descend the stairs and was not eligible to be housed in the wheelchair unit because Plaintiff did not need a wheelchair to ambulate. He was not denied programs and services because he was on a stair unit and was not in a single cell.

Plaintiff also asserts that he should not have been in a bed with a top bunk because it was difficult to get out of bed and that he needed his own toilet to address his incontinence. Plaintiff was not denied access to a toilet because of his disability; he had access to the toilet in his cell the same as every non-disabled double-celled inmate. He also had access to a supply of adult diapers in his cell. Plaintiff's request for access to his own toilet is not a reasonable accommodation. In

addition, Plaintiff's difficulty with getting out of his lower bunk because he would hit his head does not support his claim that he was denied access to a program or service. Plaintiff had a low-bunk restriction to accommodate his disability and was not denied access to a bed. Plaintiff has not established a violation of the Rehabilitation Act or ADA. Therefore, summary judgment is warranted with respect to these claims.

## B. Eighth Amendment Claims against Novak, Fink, and Syed

Plaintiff asserts Novak, Fink, and Dr. Syed violated his constitutional rights based on the conditions of his confinement and their deliberate indifference to his serious medical needs. He claims that, because he was placed on a "stair unit," he was required to walk up and down stairs to receive daily medication, perform diabetic blood tests, request a shower, access the dining area, and participate in programing. He claims that his back pain prevented him from negotiating the stairs, so he missed meals, programming, and medical appointments. With respect to his cell, Plaintiff claims he shared a cell with a roommate and that the upper bunk in the cell made it difficult to get out of bed without striking his head; he fell off the toilet because it was the wrong height and did not have grab bars; and he was forced to launder his clothing in his sink.

### 1. Deliberate Indifference

The Eighth Amendment prohibits "cruel and unusual punishment" of a prisoner. U.S. Const. amend. VIII; *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). It imposes a duty on prison officials to take reasonable measures to guarantee an inmate's safety and to ensure that inmates receive adequate medical care. *Farmer*, 511 U.S. at 832. A prison official's "deliberate indifference" to a prisoner's medical needs or to a substantial risk of serious harm violates the Eighth Amendment. *Id.* at 828; *see also Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). "This . . . does not mean, however, that every claim by a prisoner that he has not received adequate medical

17

treatment states a violation of the Eighth Amendment." *Estelle*, 429 U.S. at 105. To prevail on a claim of deliberate indifference, "a plaintiff must prove that he 'suffered from an objectively serious medical condition' and that the defendant was 'deliberately indifferent to that condition.'" *Davis v. Kayira*, 938 F.3d 910, 914 (7th Cir. 2019) (quoting *Petties v. Carter*, 836 F.3d 722, 727-28 (7th Cir. 2016)).

Defendants assert that they were not deliberately indifferent to an objectively serious medical condition. Deliberate indifference requires more than negligence or even gross negligence; it requires that the defendant knew of, yet disregarded, an excessive risk to the plaintiff's safety. *Farmer*, 511 U.S. at 825, 837; *see also Estelle*, 429 U.S. at 104. It is not enough to show that prison officials merely failed to act reasonably. *Gibbs v. Franklin*, 49 F.3d 1206, 1208 (7th Cir. 1995). "A state officer is deliberately indifferent when he does nothing . . . or when he takes action that is so ineffectual under the circumstances that deliberate indifference can be inferred." *Figgs v. Dawson*, 829 F.3d 895, 903 (7th Cir. 2016) (internal citations omitted).

Plaintiff claims Dr. Syed was deliberately indifferent to his serious medical needs. Dr. Syed signed off on the physical therapist's determination that Plaintiff was able to walk up and down stairs and needed physical therapy. Throughout 2018, Dr. Syed, HSU medical providers, and outside physicians saw Plaintiff and treated his complaints. When Plaintiff complained about pain and requested a handicap cell, Dr. Syed examined him, determined one was not necessary, and advised that Plaintiff must stay as active as possible to avoid muscle atrophy. Although Plaintiff may have disagreed with Dr. Syed's determination, mere disagreement with a defendant's course of treatment does not amount to deliberate indifference under the Eighth Amendment. *See Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996). The Eighth Amendment does not require that medical staff comply with the treatment preferences of a prisoner, and a "medical professional's

18

treatment decisions will be accorded deference 'unless "no minimally competent professional would have so responded under those circumstances.""" *Jackson v. Kotter*, 541 F.3d 688, 698 (7th Cir. 2008) (quoting *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008)); *see also Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261–62 (7th Cir. 1996) ("[D]eliberate indifference may be inferred based upon a medical professional's erroneous treatment decision only when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment."). Plaintiff has not demonstrated that Dr. Syed's medical decisions were a substantial departure from accepted professional judgment. Accordingly, Plaintiff has failed to establish that Dr. Syed was deliberately indifferent to his medical needs.

Plaintiff asserts Fink was deliberately indifferent to his serious medical needs. But Fink addressed Plaintiff's concerns to the extent of his authority. Medical providers determined a handicap cell was not necessary, and Fink did not have the authority to override medical decisions or order medical restrictions. Indeed, "[n]on-medical defendants . . . can rely on the expertise of medical personnel." *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011). Fink did, however, facilitate treatment by taking Plaintiff to the HSU when he had medical complaints and encouraging Plaintiff to submit HSRs. He also made changes to Plaintiff's living conditions when he had the authority to do so. For instance, when Plaintiff was assigned to Housing Unit 9, Fink placed Plaintiff in a cell near the end of the tier so he would be close to the showers. Plaintiff has presented no evidence that Fink was deliberately indifferent to his medical complaints; therefore, Plaintiff's claims against Fink will be dismissed.

Plaintiff claims Warden Novak was also deliberately indifferent to his serious medical needs. "Section 1983 does not create collective or vicarious responsibility. Supervisors are not

liable for the errors of their subordinates." *Pacelli v. DeVito*, 972 F.2d 871, 878 (7th Cir. 1992). As a result, an individual cannot be sued for damages under the Constitution unless she was "personally involved" in the violation. *Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017). An individual is not personally involved unless she participated in the constitutional violation or knew about the particular conduct at issue and had the ability to stop it. *Id.*; *see also Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995) ("[S]ome causal connection or affirmative link between the action complained about and the official sued is necessary for § 1983 recovery."). In this case, Novak was not personally involved in Plaintiff's medical care, did not participate in creating housing assignments, and was not involved in the decision to place Plaintiff on a unit with stairs. While written notice to prison administrators may form the basis of a deliberate indifference claim when the plaintiff demonstrates "that the communication, in its content and manner of transmission, gave the prison official sufficient notice to alert him or her to an 'excessive risk to inmate health or safety,'" *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996) (quoting *Farmer*, 511 U.S. at 837), there is no evidence that Plaintiff sent such a communication to Novak. Plaintiff submitted a single communication to Novak regarding his low-bunk restriction, and her office responded on September 27, 2018, indicating that he had a low-bunk restriction in place since January 3, 2018. Plaintiff has not established that Novak had any personal involvement in the alleged deprivation of Plaintiff's constitutional rights. Accordingly, Plaintiff's deliberate indifference claim against Novak must be dismissed.

### 2. Conditions of Confinement

The Eighth Amendment guarantees "humane conditions of confinement." U.S. Const. amend. VIII; *Farmer*, 511 U.S. at 832. "The Eighth Amendment can be violated by conditions of confinement in a jail or prison when (1) there is a deprivation that is, from an objective standpoint,

sufficiently serious that it results 'in the denial of "the minimal civilized measures of life's necessities,'" and (2) where prison officials are deliberately indifferent to this state of affairs." *Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016) (quoting *Farmer*, 511 U.S. at 834). Deliberate indifference means that the defendant "acted in an intentional or criminally reckless manner, i.e., the defendant must have known that the plaintiff was at serious risk of being harmed and decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (citations omitted).

Plaintiff claims that, because he was housed in a cell that required he walk up stairs to reach HSU, recreation, meals, and other programming, he was denied access to basic necessities. But the record shows that Plaintiff was able to walk up and down stairs, and his surgeon and physical therapist determined that he could do so. Medical staff continued to treat the medical conditions that caused Plaintiff pain, and Plaintiff was treated in accordance with his physical restrictions. Any deprivation resulted from Plaintiff's own choice to forego meals and programs because he believed mobility was difficult, not any Eighth Amendment violation.

With respect to Plaintiff's claims that the upper bunk in the cell made it difficult to get out of bed without striking his head; that he fell off the toilet because it was the wrong height and did not have grab bars; and that he was forced to launder his clothing in his sink, there is no evidence that these defendants knew that these conditions caused a serious risk and disregarded it. In short, Plaintiff's conditions of confinement claims against these defendants must be dismissed.

### C. Eighth Amendment Claims against Winkleski

Plaintiff has brought a claim for injunctive relief against Winkleski. "Article III, § 2 of the Constitution grants jurisdiction to federal courts to adjudicate only 'actual, ongoing controversies.'" *Brown v. Bartholomew Consol. Sch. Corp.*, 442 F.3d 588, 596 (7th Cir. 2006)

21

(quoting *Honig v. Doe*, 484 U.S. 305, 317 (1988)). "There is thus no case or controversy, and a suit becomes moot, 'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)). Plaintiff has been transferred from New Lisbon to Oshkosh Correctional Institution. Because Plaintiff is no longer housed at New Lisbon, his claim for injunctive relief is now moot, as "[a]ny relief that [the] judgment might permit would be purely speculative in nature." *See Ortiz v. Downey*, 561 F.3d 664, 668 (7th Cir. 2009) (finding that inmate's claim for injunctive relief against allegedly unconstitutional actions of prison officials was mooted by inmate's transfer out of the facility). Accordingly, Plaintiff's claim for injunctive relief against Winkleski is dismissed as moot.

### D. First Amendment Claims against Winkleski

Plaintiff asserts Winkleski retaliated against him by placing him in disciplinary segregation for complaining about the conditions of his confinement. "To prevail on a First Amendment retaliation claim, [Plaintiff] must show: (1) he engaged in protected activity; (2) he suffered a deprivation likely to deter future protected activity; and (3) his protected activity was a motivating factor in the defendants' decision to retaliate." *Daugherty v. Page*, 906 F.3d 606, 610 (7th Cir. 2018) (citation omitted). In this case, Plaintiff's protected activity of writing grievances regarding the conditions of his confinement was not the motivating factor in the issuance of the conduct reports and disciplinary segregation. Plaintiff engaged in prohibited conduct when he brought Wisconsin statutes to a PSU appointment and insinuated that the PSU clinician was required assist him with his lawsuit and when he told his social worker that an officer refused to give him his medication, even though he had received it. No reasonable jury could conclude that Plaintiff's grievances were a motivating factor in the issuance of the two conduct reports and his disciplinary

segregation. In addition, Winkleski was not involved in writing the conduct reports or issuing the discipline associated with them. Therefore, Winkleski did not participate in any adverse action that could lead to liability. Summary judgment in favor of Winkleski on this claim is appropriate.

## CONCLUSION

For these reasons, Defendants' motion for summary judgment (Dkt. No. 159) is **GRANTED**. Plaintiff's motion to amend his summary judgment submissions and to amend his complaint (Dkt. No. 183) is **GRANTED-IN-PART** and **DENIED-IN-PART**. Plaintiff's motion is granted as to his request to amend his response to Defendants' motion for summary judgment and denied in all other respects. Plaintiff's motion for a preliminary injunction (Dkt. No. 172), motion for emergency intervention (Dkt. No. 175), motion to expedite preliminary injunction hearing (Dkt. No. 186), and motion for order to show cause and temporary restraining order (Dkt. No. 190) are all **DENIED**. This case is dismissed. The Clerk is directed to enter judgment accordingly.

**SO ORDERED** at Green Bay, Wisconsin this 17th day of September, 2020.

/s/ William C. Griesbach
William C. Griesbach
United States District Judge